IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| JEB STUART AUCTION SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:14-cv-00047 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WEST AMERICAN INSURANCE COMPANY, | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| | ) | |
| Defendant. | ) | |

This matter is before the Court following a bench trial on the merits of Plaintiff Jeb Stuart Auction Services, LLC's ("Jeb Stuart") claim for attorneys' fees pursuant to section 38.2-209 of the Code of Virginia. The matter was tried on April 28, 2016, and this Memorandum Opinion represents my findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a). For the reasons stated herein, I find that Defendant West American Insurance Company ("West American") acted in good faith in investigating Jeb Stuart's representations on an application for insurance, and therefore Jeb Stuart is not entitled to recover its attorneys' fees expended in prosecuting this matter.

### I. FINDINGS OF FACT

Although the facts are relatively well-recounted in my Opinions on the two summary judgment motions (see Mem. Op. pgs. 1–3, Aug. 13, 2015 [ECF No. 39]; Mem. Op. pgs. 1–5, Oct. 1, 2015 [ECF No. 59]), I will summarize the most relevant facts again here, making special note of the few instances in which the parties have offered competing versions of events.

Jeb Stuart is a single-member limited liability corporation ("LLC") located in Stuart, Virginia. Robin Hiatt ("Hiatt") is Jeb Stuart's managing and sole member. West American is an

Indiana-based insurance provider, and Burch Hodges Stone, Inc. ("BHS") is a Virginia-based insurance agency that markets and sells, among other things, West American commercial insurance policies. Dianne Joyce ("Joyce") is a commercial insurance agent with BHS and has been with the agency for thirty-eight years. Diane Via Fulcher ("Fulcher")[1] is also an insurance agent at BHS and has been in the insurance business for forty-seven years.

On January 13, 2014, Hiatt[2] had an appointment with Fulcher at BHS about purchasing a commercial insurance policy on a large piece of property Jeb Stuart was planning to acquire. Fulcher took information from Hiatt regarding Jeb Stuart and the property, and she promised to call him back with quotes from various carriers.

On January 22, 2014, Hiatt returned to BHS to fill out an application for a West American commercial insurance policy. Fulcher introduced Hiatt to Joyce, who was to handle the policy once it was issued. At this meeting, Fulcher went through the entire insurance application with Hiatt and assisted him in filling it out. While Fulcher went through the questions, Joyce input Hiatt's answers into an electronic application. Of particular relevance now, "Question Eight" on the application asked, "DURING THE LAST FIVE YEARS (TEN IN RI), HAS ANY APPLICANT BEEN INDICTED FOR OR CONVICTED OF ANY DEGREE OF THE CRIME OF FRAUD, BRIBERY, ARSON OR ANY OTHER ARSON-RELATED CRIME IN CONNECTION WITH THIS OR ANY OTHER PROPERTY?" Hiatt, on behalf of Jeb Stuart (who was the sole applicant for the insurance policy), answered, "No." Hiatt signed the application and left.

Unbeknownst to Fulcher and Joyce, *Hiatt* had been convicted of a crime of fraud within the last ten years. In 2009, Hiatt entered an <u>Alford</u> plea to charges that he obtained money by

---

[1] In the various motions, pleadings, and opinions in this case, Fulcher has been alternatively referred to as "Diane Via," "Diane Fulcher," and "Diane Via-Fulcher."

[2] Throughout this opinion, almost all references to actions taken by Hiatt refer to actions taken in his capacity as Jeb Stuart's managing member.

false pretenses. He admitted to hiring individuals to wreck cars so that he could receive the proceeds from the applicable insurance policies.

On January 30, 2014, Hiatt returned to BHS. Hiatt spoke with Fulcher about lowering the policy limits on Jeb Stuart's policy because he felt they were too high.[3] He also told Fulcher that he had had some "personal financial issues" in 2008 but that they were resolved. She told him that, because the financial problems were personal and not business-related, they were not relevant to the LLC's application for insurance.[4]

Shortly after that meeting ended, Fulcher prepared a "visit note" regarding her meeting with Hiatt. It reads, in relevant part:

> DV    01/30/2014  12:14 PM
> wanted to know if could reduce limit from $3mil on 1 bldg, I explained this is a Functional Replt & company will not change. Also said he had financial problems as individual in 2008 but not in business name

(Tr. Def.'s Ex. 9.)[5] West American issued Jeb Stuart the policy for which Hiatt applied.

On March 3, 2014, a fire destroyed the property insured by Jeb Stuart's policy. West American sent one of its claims adjusters, Anthony DeCesare ("DeCesare") to investigate the fire. As part of his investigation, DeCesare had Hiatt engage in an Examination Under Oath ("EUO") on June 25, 2014. During the day-long session, questions were propounded to Hiatt by

---

[3] The coverage limits were $4,050,000.00; at the time of his conversation with Fulcher, Hiatt had negotiated a sales price on the property of $325,000.00.

[4] Hiatt offered a much different version of events. According to Hiatt, after he reviewed the application at home following the January 22 meeting, he was unsure whether his "no" answer to Question Eight was appropriate. Although Jeb Stuart—the LLC and applicant for insurance—had never been convicted of a crime, he thought his personal criminal history may be relevant. He testified that he spoke with either Fulcher or Joyce, told them the extent of his criminal history, but was told that his criminal convictions "did not matter" because it was Jeb Stuart, not Hiatt, that was applying for the insurance policy. For the reasons discussed in Section II.f, I do not believe Hiatt's testimony about that meeting is accurate.

[5] All references to exhibits refer to those entered into evidence during the April 28 trial. [ECF No. 78.]

- 3 -

Case 4:14-cv-00047-JLK-RSB   Document 81   Filed 06/16/16   Page 3 of 10   Pageid#: 1985

Andrew Watson ("Watson"), one of West American's attorneys, in a format very similar to a deposition. Hiatt's attorney was also present. During the EUO, Hiatt first disclosed to West American that he had been convicted of several crimes that would have been responsive to Question Eight had he been the applicant. Hiatt also relayed his version of events regarding the January 30 meeting—specifically, that he told Fulcher about his criminal history, but she replied that it did not matter because the application only concerned Jeb Stuart's history. Upon learning of Hiatt's claim what he told West American's representatives about his criminal history, neither DeCesare nor Watson followed up with Fulcher or Joyce to determine if that conversation ever took place.

Following the EUO, Watson drafted a letter informing Hiatt that West American would be denying Jeb Stuart's claims due to material misrepresentations on its application. West American took the position that Hiatt's personal criminal background *was* responsive to Question Eight and that, by failing to disclose it, Hiatt (on behalf of Jeb Stuart) lied on the application. Additionally, the denial letter stated, in part,

> At this third meeting [on January 30 at BHS], Mr. Hiatt says he had realized the conviction information under Question 8 was incorrect and he asked Ms. Joyce at BHS about it. Ms. Joyce admitted to Mr. DeCesare that she told him that the question about convictions "did not matter", because he was purchasing insurance for Jeb Stuart Auction Services, LLC and not individually for himself. *EUO, p. 153–54*. The statements made by Ms. Joyce were not authorized by West American, nor was she empowered to bind West American through her statements.

(Tr. Pl.'s Ex. 1.) As it turns out, no one from West American had ever spoken to Joyce or Fulcher about the January 30 meeting. Watson forwarded the letter to DeCesare, who signed it and mailed it to Hiatt on August 6.

Jeb Stuart brought suit in this Court to recover the value of the insurance policy he claimed was wrongfully cancelled. At the summary judgment stage,[6] I held that, by its terms, Question Eight only addressed the "applicant's" criminal history and that, because Jeb Stuart was a legal entity separate and apart from Hiatt, Hiatt's answer to Question Eight was correct. (See Mem. Op. pgs. 6–12 [ECF No. 39].) As a result, West American wrongfully voided Jeb Stuart's policy and was liable for the appropriate coverage.

In his Complaint, Hiatt also asserted a claim for attorneys' fees pursuant to Va. Code Ann. § 38.2-209 (see Compl. ¶¶ 44–46 [ECF No. 1]), which permits an insured to recover his attorneys' fees from his insurer if the court determines that "the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy." I held a bench trial on April 28, 2016, to address this claim.

## II. DISCUSSION

The only question before the Court is whether West American's denial of Jeb Stuart's claim was "not in good faith." See Va. Code Ann. § 38.2-209 (2015). This is a question of law for the Court to decide. See REVI, LLC v. Chicago Title Ins. Co., 776 S.E.2d 808, 812 (Va. 2015).

> [I]n evaluating the conduct of an insurer, courts should apply a reasonableness standard. A bad-faith analysis would require consideration of such questions as whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact.

---

[6] There was a second summary judgment issue regarding the appropriate measure of damages (see Mem. Op. [ECF No. 59]), but it is not relevant here.

CUNA Mut. Ins. Soc. v. Norman, 375 S.E.2d 724, 727 (Va. 1989). In my Memorandum Opinion on a prior summary judgment motion in this case, I added the following consideration:

> [A]lthough not enunciated as a factor in Norman, I believe a fact-finder must examine the question of whether Hiatt accurately portrayed his criminal record to []Fulcher. I believe the facts surrounding those conversations are highly relevant, although not necessarily dispositive. The parties differ vastly on whether Hiatt was honest or circumspect in the information he gave []Fulcher. If he was honest and West American was on notice of his criminal record, I do not believe West American's cancellation of the policy could be characterized as in "good faith." On the other hand, if Hiatt intentionally misled []Fulcher regarding his criminal record, it is possible that West American's position, although ultimately incorrect, was undertaken in good faith.

(Mem. Op. pgs. 12–13 [ECF No. 39].) All of these factors will be addressed in turn.

    a. <u>Reasonable minds</u>

The first factor in Norman asks whether reasonable minds could differ in the interpretation of policy provisions or, in this case, application questions. Although West American ultimately lost on this issue at the summary judgment stage, I believe that, under the unique facts of this case, reasonable minds could differ as to whether a question concerning criminal history applied to the LLC or to the LLC's members. Primarily, as West American argued, the question of whether an LLC has a prior criminal history is, admittedly, confusing. Criminal laws typically target and punish individuals, and the types of crimes addressed by Question Eight overwhelmingly ensnare individuals, not corporate entities. Therefore, although the question, by its terms, applied to the applicant (the LLC), a reasonable person reading Question Eight might interpret it to apply to the individuals that make up the LLC. Undoubtedly, that is what West American envisioned when it drafted the application, and Question Eight in particular. This factor weighs in favor of West American.

### b. Reasonable investigation

The second <u>Norman</u> factor—whether West American made a "reasonable investigation" of Jeb Stuart's claim—must weigh in favor of Jeb Stuart. According to the testimony of West American's Claims Adjuster Anthony DeCesare, DeCesare was made aware of Hiatt's claim that he told West American's agents (Fulcher and Joyce) about his criminal history. As I stated in a prior Opinion, if West American was on notice of Hiatt's criminal history and told him that it did not matter, it was in a precarious position denying Jeb Stuart's claim on the basis that Hiatt misrepresented his criminal history on the application. Nevertheless, upon learning of Hiatt's claim that he told Fulcher about his criminal history, DeCesare never undertook any investigation whatsoever to determine if Hiatt had spoken with Fulcher or Joyce about his criminal history. In other words, upon learning that the insured claimed he told West American's agents about the very issue that justified rescission of the policy on the grounds of dishonesty, DeCesare did not investigate it *at all*. Such willful ignorance of the facts cannot be said to be a "reasonable investigation" of this claim.

Additionally, the actions of Andrew Watson, West American's outside counsel, in drafting the rescission letter evidence poor attention to detail and to the facts of the investigation. According to the letter drafted by Watson, approved and signed by DeCesare, and sent to Jeb Stuart, "Ms. Joyce admitted to Mr. DeCesare that she told [Hiatt] that the question about convictions 'did not matter,' because he was purchasing insurance for Jeb Stuart Auction Services, LLC and not individually for himself." (Tr. Pl.'s Ex. 1.) At trial, Watson essentially testified that nothing in that sentence is correct.[7] Nevertheless, without ever inquiring as to the

---

[7] Watson unconvincingly characterized this entire sentence as a "typographical error," but that explanation holds no water. Moreover, Watson advised Hiatt that "Ms. Joyce . . . was [not] empowered to bind West American through her statements." His ignorance of Va. Code Ann. § 38.2-1801(A), which states that "[a] licensed agent shall be held to be the agent of the insurer that issued the insurance sold,

- 7 -

Case 4:14-cv-00047-JLK-RSB   Document 81   Filed 06/16/16   Page 7 of 10   Pageid#: 1989

truth or falsity of that statement, Watson drafted and DeCesare signed it. As it turns out, that sentence encapsulates the entire dispute between the parties. The fact that it was drafted, reviewed, and sent to the insured without being accurate evidences a lack of professionalism that would give any reasonable person pause. As such, I cannot say that West American undertook a "reasonable investigation" of Jeb Stuart's claim insofar as it completely ignored Hiatt's allegation that West American's agents told him to answer Question Eight exactly as he did.

    c. Reasonable evidence

The third factor is whether the evidence reasonably supported a denial of coverage. Here, I must side with Jeb Stuart. As stated above, West American failed to investigate Hiatt's claim that he told Fulcher about his criminal history. Thus, it never uncovered the evidence that would have supported or undercut its claim relating to the denial of coverage.

    d. Settlement tactics

There is no contention that West American used its investigation into Jeb Stuart's application answers as a settlement negotiation tactic, so the fourth factor espoused by the Norman court favors West American.

    e. Issue of first impression

Finally, West American's position at the summary judgment stage—although ultimately incorrect—did present an issue of first impression. Neither party was able to rely on a case on point regarding the issue of whether questions on an LLC's insurance application asking about criminal history applied to the members of the LLC, to the corporate entity, or to both. Although I believe the answer to that question is clear, I am not aware of any other court being called upon

---

solicited, or negotiated by such agent in any controversy between the insured . . . and the insurer[,]" is inexcusable. See, e.g., Harris v. McKay, 122 S.E. 137, 140 (Va. 1924) ("The act of the agent is the act of the principal."); Lott v. Scottsdale Ins. Co., 827 F. Supp. 2d 626, 636 & n.12 (E.D. Va. 2011) (holding that an insurance agent's knowledge of facts is imputable to the insurer).

- 8 -

to answer it. Therefore, although it was unsuccessful in asserting its defense to Jeb Stuart's claim, West American's position did present a novel legal question. As such, the final Norman factor weighs in favor of a finding of good faith.

On the whole, I believe the Norman factors weigh equally in favor of both parties. West American's inadequate investigation of Hiatt's claim was an error in judgment, but its position was not taken to obscure its own wrongdoing or to compel Jeb Stuart to take less than the amount to which it was entitled. Turning to the issue of whether Hiatt was honest in his dealings with West American's agents, Hiatt's version of events is not supported by the evidence.

    f.   Hiatt's dealings with West American's agents

Although I ultimately concluded that Hiatt's personal criminal history was not the subject of Question Eight, I believe that he was circumspect in his dealings with West American. This issue essentially turns on the question of credibility. Hiatt claims he told Fulcher and Joyce about his criminal history; Fulcher maintains Hiatt only told her that he had personal financial difficulties in the past. Taking all the evidence into consideration, I believe Fulcher. Although it would be easy to dismiss Hiatt's testimony given his history of lying with regard to insurance policies and proceeds,[8] it is on the basis of the documentary evidence that I conclude that the conversations proceeded as West American claims. According to the office notes created by Fulcher after her January 30, 2014, meeting with Hiatt, Hiatt "said he had financial problems as individual in 2008 but not in business name". (Tr. Def.'s Ex. 9.) This record, created shortly after the conversation between Hiatt and Fulcher took place and before any suspicion was ever shown regarding Jeb Stuart's application, confirms Fulcher's recollection of the events. Because her version is starkly at odds with Hiatt's and is confirmed by West American's records, and

---

[8] In addition, the sequence of events casts doubt on Hiatt's actions: Hiatt purchased the insurance on January 22, purchased the property on February 11, and the property was consumed by fire on March 3.

because the office notes were created at or near the time of the event and before a dispute ever arose that pitted Fulcher against Hiatt, I find her version of events to be the most credible.

Taking all of these factors into account, I conclude that West American's position was undertaken in good faith. Had DeCesare performed a complete investigation, he would have uncovered what the trial made clear: Hiatt never mentioned his criminal history to Fulcher or Joyce. For this reason, Jeb Stuart is not entitled to recover its attorneys' fees under Va. Code Ann. § 38.2-209.

### III. CONCLUSION

When considering all the evidence as well as the factors set forth by the Supreme Court of Virginia in CUNA Mutual Insurance Society v. Norman, West American's position in denying insurance coverage, although wrongful, was undertaken in good faith. Accordingly, each party will bear its own costs associated with this matter.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 16th day of June, 2016.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE